Filed 6/23/22  P. v. Washington CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C070732 |
| Plaintiff and Respondent, | (Super. Ct. No. 09F07195) |
| v. | ORDER MODIFYING OPINION AND DENYING REHEARING [CHANGE IN JUDGMENT] |
| QUINCY ISIAH WASHINGTON et al., | |
| Defendants and Appellants. | |

THE COURT:

It is ordered that the opinion filed on May 26, 2022, be modified as follows:

1)  At the first full paragraph on page 4 of the Slip Opinion insert:  ", and Washington's firearm enhancement," so that the first sentence of the paragraph now reads:  "We shall reverse the gang enhancements, and Washington's firearm enhancement, and remand to provide the prosecution an opportunity to retry the enhancements under the law as amended by Assembly Bill No. 333."

1

2) In a new paragraph at the end of page 50 before the heading "Sentencing Error" insert:  "Reversal of Washington's gang enhancements requires reversal of his firearm enhancement under Penal Code section 12022.53, subdivisions (d) and (e), as the firearm enhancement was predicated on a valid true finding on the gang enhancement. (See *Lopez, supra,* 73 Cal.App.5th at pp. 346-348; *People v. Vasquez* (2022) 74 Cal.App.5th 1021, 1033.)  The prosecution will have the opportunity to prove the related vicarious firearm enhancement along with the gang allegations."

3) On page 51, after the sentence beginning with "In light of the amendments to section 186.22 made by Assembly Bill No. 333," insert:  "We further reverse defendant Washington's firearm enhancement (which was predicated on the gang enhancements) and remand to provide the prosecution an opportunity to retry it."

This modification results in a change in judgment.

The petition for rehearing is denied.

BY THE COURT:

_____
HULL, Acting P.J.

_____
HOCH, J.

2

Filed 5/26/22  P. v. Washington CA3 (unmodified opinion)

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C070732 |
| Plaintiff and Respondent, | (Super. Ct. No. 09F07195) |
| v. | |
| QUINCY ISIAH WASHINGTON et al., | |
| Defendants and Appellants. | |

On a September afternoon in 2010, 16-year-old C.T. was "hanging out" outside a house on Bishopgate Court in South Sacramento with friends, three of whom were affiliated with a street gang called Guttah Boyz.  Their good time together ended and her life was to be changed forever after one of the friends came out of the house and made a face that caused the other friends to turn and look at a group of boys coming up the court, whereupon everyone started running into the house.

1

C.T. ran as well but was able during her escape to recognize two of the faces in the approaching group of boys, though she was reluctant to disclose their names in response to questioning at trial. Prodded, she testified that she recognized "Little Diddy" (defendant Allen Deshaun Oliver) and a boy she knew as Isiah (defendant Quincy Isiah Washington); that she probably told a detective that Little Diddy pulled out a gun and Little Diddy probably shot her; and that when shown a picture of Little Diddy after the shooting she broke down in tears and told a detective the shooting would never get out of her head. She recognized Washington from a party she attended the day before when he pulled out a long black revolver like the gun she saw at the shooting.

C.T. was the last in the line of people running into the house. She did not make it. Though at trial she could not recall hearing gunshots, a bullet entered the middle of her back. She was transported to the hospital by friends and lost function in her right hand.

Mere happenstance or chance could not explain the intersection of these two groups of young people and the tragedy that ensued. Antoine Jackson instantly recognized the looming danger posed by Little Diddy and the group of gang members behind him; they had not come to talk but, in Jackson's words, were coming for "funk." One yelled "FAB" before gunshots rang out. As Little Diddy approached, Jackson told everyone to get in the house and then ran also, returning quickly to the outside after hearing four gunshots, only to find C.T. lying on the ground. The group of gang boys also ran, laughing gleefully as they went, before climbing over a fence at the end of the cul-de-sac.

No sense can be made of this senseless violence, but the motivation was explained by a gang expert who spoke of a long-standing and deadly conflict between the G-Mobb gang and its subsets, on the one hand, and the Oak Park Bloods and its FAB subset on the other. Five homicides and 20 other shootings resulting in injury had occurred, and all involved a shooter in a group setting.

Eyewitnesses identified Oliver as the shooter in this instance. A sixth amended information charged defendants with attempted murder and shooting at an inhabited dwelling. (Pen. Code, §§ 664/187, subd. (a), 246.)[1] A jury found Oliver guilty on both counts and Washington guilty of shooting at an inhabited dwelling. The court sentenced Oliver to 17 years in state prison plus an indeterminate term of 55 years to life, and Washington to five years in state prison plus an indeterminate term of 25 years to life.

Defendants appeal, contending (1) insufficient evidence supports Washington's conviction of shooting at an inhabited dwelling, (2) the court erred in allowing evidence of Washington's prior criminal activity, (3) ineffective assistance of counsel in defense counsels' failure to object to a hearsay statement and to the prosecutor's improper comments during closing argument, and (4) cumulative error. (5) Defendants argue their sentences constitute cruel and unusual punishment under the Eighth Amendment to the United States Constitution by reason of their young ages. (6) Oliver also asserts sentencing error. Following the original briefing, legislative changes and California Supreme Court decisions led to supplemental briefing and additional arguments by defendants. Defendants were able to avail themselves of these ameliorative decisions because of the delay in bringing their appeals to finality. In supplemental briefing defendants argue: (7) The equal protection clauses of the state and federal Constitutions require the parole eligibility dates of both defendants to be set in accordance with section 1170, former subdivision (d)(2)(A). Washington asserts as a fallback position, that if the court rejects his equal protection argument, it should modify his sentence to reflect that he will be eligible for parole after serving 25 years of his sentence. (8) Both defendants challenge portions of testimony provided by gang expert Detective Justin Saario as case

---

[1] All further statutory references are to the Penal Code unless otherwise designated.

specific hearsay under the California Supreme Court's holding in *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*), decided after the jury's verdict herein, and argue the improper admission of the evidence compels reversal.  (9) Both defendants argue the judgment must be conditionally reversed, and the case remanded to the juvenile court for a transfer hearing pursuant to Proposition 57, and insist if the case remains in adult court both defendants should be afforded a "*Franklin* Hearing"[2] to establish a factual predicate for later parole consideration.  (10) Both defendants argue the case must be remanded to permit the court to exercise the discretion afforded by Senate Bill No. 620 (2017-2018 Reg. Sess.) to dismiss the firearm enhancement imposed under section 12022.53.  And finally, (11) both defendants argue changes to section 186.22 made by Assembly Bill No. 333 (2021-2022 Reg. Sess.) require that we reverse the gang enhancement findings.

We shall reverse the gang enhancements and remand to provide the prosecution an opportunity to retry the enhancements under the law as amended by Assembly Bill No. 333.  We shall conditionally reverse the remaining judgments, and remand to the juvenile court for juvenile transfer hearings.  Should either defendant's conviction and enhancement findings be reinstated, his matter shall return to the trial court for a new sentencing hearing and an exercise of discretion under Senate Bill No. 620 (2017-2018 Reg. Sess.) (Stats. 2017, ch. 682, §§ 1 & 2).  Defendants shall be given an opportunity to supplement the record with information relevant to a future youth offender parole hearing.  We also direct the trial court to correct an error in Oliver's abstract of judgment. In all other respects, the modified judgments shall be affirmed.

---

[2]  *People v. Franklin* (2016) 63 Cal.4th 261 (*Franklin*).

## FACTUAL AND PROCEDURAL BACKGROUND

The events underlying the charges against defendants transpired in a matter of minutes and can be quickly summarized. C.T. and a group of friends were sitting outside a house in the early afternoon when a group of young men walked up the street. One of them pulled out a gun and began firing. As C.T. ran, bullets struck her in the back. As a result of the injury, C.T. lost function in her right hand. Under the prosecution's theory of the case, Oliver fired the weapon, aided by Washington. The shooting was part of an escalating war between two rival gangs.

A sixth amended information charged defendants with premeditated attempted murder and shooting at an inhabited dwelling. The information further alleged both defendants' crimes were committed for the benefit of or in association with a criminal street gang. (§ 186.22, subd. (b)(1).) In the case of Oliver, the information alleged that with respect to both offenses he personally and intentionally discharged a firearm, causing great bodily injury. (§ 12022.53, subd. (d).) In the case of Washington, the information alleged with respect to both offenses that a principal personally and intentionally discharged a firearm, causing great bodily injury. (§ 12022.53, subds. (d), (e)(1).) Finally, as to Oliver, the information alleged he personally inflicted great bodily injury within the meaning of section 12022.7, subdivision (a).

A jury trial followed. The jury informed the trial court that it could not reach a verdict and the trial court declared a mistrial. The following evidence was introduced at the second jury trial.

## C.T.'s Testimony

The victim of the shooting, C.T., was a reluctant witness at the second trial. She acknowledged that being a witness in the case caused stress. She thought "this time in my life is over" and she had "moved on." "[D]ealing with that on top of everything else that I'm dealing with and my personal issues is just too much." She no longer wanted to be bothered. Her memory was refreshed with a recording of an interview between her

and Detective Saario at the hospital two days after the shooting. The recording was played in open court. Her testimony did not flow as smoothly as the recording.

In summary, the afternoon of the shooting, 16-year-old C.T. sat outside a house with a female friend, Quisha, and three male friends, Jackson, Jamal Dawson, and Deandre G. Jackson, Dawson, and Deandre were all affiliated with a criminal street gang known as the Guttah Boyz. She knew Guttah Boyz had a conflict with a gang called Gunz Up.

C.T. noticed Deandre make a face as he stepped out of the front door of the house. When she turned around, C.T. saw a group of young men walking up the street in a group. Among the group, C.T. recognized a person she knew as Little Diddy and another individual she knew as Isiah Washington, which is Washington's middle name.

C.T. saw Little Diddy put his hand to his waist. As Little Diddy pulled out a gun, everyone began to run. C.T. also fled but was shot in the back as she ran. When interviewed by Detective Saario, she recalled hearing multiple shots, falling to the ground, and going numb.

C.T. remained in the hospital for about one week. The gunshot damaged the nerves in her hand and she is not able to fully utilize her right hand. At trial, C.T. could not write with her right hand or open it completely. She had given up on her plans to work in the medical field.

A few days after the shooting, C.T. provided officers with descriptions of the suspects. She described Little Diddy as a five feet eight inches tall, 16- or 17-year-old male with dark skin. He wore a white T-shirt, jeans, and a grey beanie. C.T. described Washington as a skinny, five feet six inches tall, 15- to 16-year-old male with dark skin and a short "afro." Washington wore a white shirt and jeans.

On the same day, a detective showed C.T. photographs of Oliver and asked if she recognized him. C.T. began to cry and identified the person in the photographs as Little Diddy. She was positive he was the person who shot her. C.T. knew both Little Diddy

6

and Washington prior to the shooting. Washington had been involved with one of her friends. She knew Little Diddy because they went to camp together in the past. She had seen both men at a party the day before the shooting. At the party, she saw Washington pull out a gun, which she described as a long black revolver. By revolver, C.T. referred to a gun "with a wheel." The gun she saw at the shooting was also a "wheel type gun."

**Antoine Jackson's Testimony**

Jackson was part of the group that included C.T. the day of the shooting. Four or five people walked up the street, including Washington, Washington's brother Isaac, Little Diddy (Oliver), Deqwon Davis, and Darias. Oliver walked in the front of the group, with the others behind.

Jackson told the others on the porch that members of the "Gun Niggers" were here and told everyone to get inside the house. Jackson knew Oliver and the others were not coming to talk, but that they were coming for "funk." Jackson saw Isaac, Isiah, Deqwon and Darias. Deqwon and Darias were members of the FAB street gang. Isaac, Isiah and Little Diddy were members of the Gunz Up street gang. During a February 3, 2010 interview with Detective Saario, however, Jackson talked about an incident during which Junius Winters was shot. According to Jackson, several Gunz Up members, including Washington and Oliver, were involved.

Oliver and Jackson made eye contact and Oliver shook his head as though to warn Jackson. Jackson did not see Oliver pull out a gun. Jackson ran into the house and then heard four shots. When he went back outside, Jackson found C.T. lying on the ground. After the shooting, Oliver's group ran toward the end of the cul-de-sac.

Jackson believed Davis was the shooter, although he did not see Davis pull out a gun. Davis had a reputation for shooting, and just before the shooting Davis had a look on his face like a smile. Jackson believed Dawson was the target and that C.T. was merely an innocent bystander.

7

**Female Resident's Testimony**

At the time of the shooting, a woman and her daughter were living at the house where the shooting occurred. Deandre and his mother also lived there. The woman testified at trial. Some of Deandre's friends stood outside the house. The woman stepped outside and noticed some boys coming around the corner. The boys were African-American teenagers who wore white T-shirts. After one of the boys yelled "FAB," gunshots rang out.

The woman did not see who fired the gun and did not know if it was the same person who yelled "FAB." She did note that the group of boys who had approached the house were together in the street during the shooting. She heard four or five gunshots.

After the shooting, she saw a girl on the ground. She took the girl to the hospital. When she returned, the woman found bullet holes in the hallway, front bathroom, master bathroom, and in a post near the front walkway of the house.

**Officer Jason Hewitt's Testimony**

Officer Jason Hewitt responded to the shooting and found a pool of blood on the porch and a hole through the front porch window. A search of the area failed to uncover any shell casings. According to Officer Hewitt, such casings are more likely to be found when a semiautomatic weapon is fired as opposed to a revolver. Shell casings from a revolver stay inside the firearm after it is fired, while a semiautomatic ejects empty shell casings.

**Officer Nicholas Fox's Testimony**

Officer Nicholas Fox obtained video footage from a home surveillance system located in a nearby house. He viewed footage close in time to the shooting. The footage showed five African-American juvenile males climbing over the fence at the end of the cul-de-sac and running down the street. They ran in the direction of the residence of a known Gunz Up gang member.

**Neighbor No. 1's Testimony**

A neighbor who lived on the same street where the shooting took place testified. Before the shooting he was outside his house with his wife and mother-in-law. He heard five gunshots and told his wife and mother-in-law to get down on the ground.

After the shooting, he saw five young African-American males running away. They ran in a group and were laughing. He did not hear anyone yell "FAB." The males climbed over a fence, and the last one over was holding a gun that looked like a black revolver with a long barrel. The neighbor ran to the house where he heard a lot of commotion and saw a five-year-old boy coming out stating that his sister got shot. He told the boy to call 911 and then jumped in his truck and tried to follow.

The neighbor then saw Dawson with a gun, chasing the males who had climbed the fence. The neighbor told Dawson to put the gun away because the police were coming. Although he looked for the boys with his truck, he did not see them again. He told officers that all the males wore jeans and no shirts, except for the one with the gun, who wore a white shirt. The shooter was about six feet tall with a slender build. They were wearing red braids. The man with the gun had dreads. The neighbor's description of the shooter's distinctive hair matched photographs of Oliver introduced at trial.

**Detective Justin Saario's Testimony**

The prosecution offered the testimony of a gang expert to support its theory that the shooting was related to a conflict between two gangs. Detective Saario worked in the gang suppression unit and had investigated over 50 cases involving African-American gangs. He had attended formal gang training conferences and had testified at least 11 times at trial regarding African-American gangs. The trial court recognized Detective Saario as an expert on African-American gangs.

Detective Saario explained derivations of the Guttah Boyz gang and the Gunz Up gang. Guttah Boyz and a gang called Starz Up are subsets of the G-Mobb gang. There

are approximately 150 G-Mobb members in Sacramento. G-Mobb's principal rival is the Oak Park Bloods gang.

The Oak Park Bloods have around 250 members and various subsets, including Zilla, Ridezilla, or Underwood Zilla (Zilla) and the Fourth Avenue Bloods, or FAB. Zilla is the "all star team" of the Oak Park Bloods, and to be a member you need to do prison time or something serious for the Oak Park Bloods.

Gunz Up is a split-off gang from the Starz Up gang. After breaking away from Starz Up, Gunz Up members associated with the Oak Park Bloods and the FAB subset. As a consequence, Gunz Up and Guttah Boyz have become rivals and enemies.

The primary activities of Gunz Up are residential burglaries, weapons possessions, assaults with a deadly weapon, shootings into an inhabited dwelling, and attempted murder. Gunz Up identifies with the number 10-5 and has its own gang signs.

Detective Saario testified as to the long-standing, volatile conflict between G-Mobb and the Oak Park Bloods. In 2008 Thomas Bryant, a FAB member, shot Philip Tigner in the back at a light rail station. Tigner was friendly with G-Mobb gang members. Bryant was accompanied by other gang members from FAB during the shooting. The same year, an Oak Park Blood member was shot and killed at a party attended by G-Mobb gang members. The shooting escalated the tensions between the gangs, and Detective Saario described it as "gasoline on the fire."

According to Detective Saario, between May 2008 and July 2010 there were 26 incidents between G-Mobb and the Oak Park Bloods and their subsets. These 26 incidents resulted in five homicides and 20 other shootings resulting in injury. Most victims were juveniles. The incidents all involved a shooter in a group setting, a group dynamic common to the rivalry between the two gangs.

In addition, Detective Saario stated, the actions of the gang members who accompanied the shooter also benefited the gang. These other members provided backup and aided the shooter. Based on Detective Saario's experience and his contact with gang

10

members, the shooting would not have occurred had it not been for the participation of these other gang members. In his opinion, the group dynamic allowed the shooting to occur.

With respect to a shooting on Nedra Court, Jackson recalled to Detective Saario that on the day of the shooting, Jaren Jones "g[o]t into it" with Gunz Up members, including Isaac and Isiah. Little Diddy was also present. Jackson identified Isaac, Isiah, and Little Diddy in photographs shown to him by Detective Saario. At trial, Jackson testified that Little Diddy was Oliver and that he was familiar with brothers named Isiah and Isaac Washington. Detective Saario testified that Washington's nickname was "Isiah," his middle name is Isiah, and Washington's brother's nickname was "Isaac."

**Documentary Evidence**

The prosecution introduced photographs and a video establishing defendants' gang involvement. People's Exhibit No. 11 showed Washington with other known Gunz Up members, making the "Gunz Up" gang sign. People's Exhibit Nos. 10 and 13 showed Washington making a "Starz Down" gesture, a sign of disrespect to the Starz Up gang. People's Exhibit Nos. 7, 8 and 9 were images of Washington "throwing a Zilla gang sign." Zilla was described by Detective Saario as basically an "all star team" of the Oak Park Bloods, a group that Gunz Up members associated with. Detective Saario also described a "J. Rock" tattoo on the webbing of Washington's fingers. J. Rock was known to Detective Saario as Jalen Spearman, a validated Gunz Up member. Detective Saario located People's Exhibit No. 22, a video, on Washington's cellphone. The video showed Guttah Boyz and Starz Up gang members disrespecting Gunz Up members.

**Defense Case**

*Neighbor No. 2's Testimony*

A second neighbor, who lived on the same street where the shooting took place, testified. He saw a man in a dark shirt with a small handgun, which he believed was a

11

semiautomatic. The man walked down the street and tucked the gun into the waistband of his pants. Officers detained the man, who may have been Dawson.

### *Neighbor No. 3's Testimony*

The surveillance tape officers reviewed was from the residence of another neighbor. That neighbor saw the image of a person running on the tape and assumed the person had climbed the fence at the end of the street. He had seen people do this in the past, since the fence was a shortcut.

## Stipulation

The parties stipulated that Washington was 16 years of age and Oliver was 17 years of age at the time of the shooting. The parties also stipulated that Bryant was convicted of attempted murder with a gang enhancement for the benefit of FAB, a criminal street gang.

## Verdict and Sentencing

The jury found Oliver guilty of one count of attempted murder (§§ 187, subd. (a), 664) and one count of shooting at an inhabited dwelling (§ 246), and found true all of the allegations except the allegation that the attempted murder in count one was committed willfully, deliberately, and with premeditation. The jury did not reach a decision on that allegation and the judge declared a mistrial on it.

The jury found Washington guilty of shooting at an inhabited dwelling (§ 246) and found all the related allegations true. The jury could not reach a verdict on one count of attempted murder and the court declared a mistrial on that count.

The court sentenced Oliver to a determinate term of 17 years in state prison plus an indeterminate term of 55 years to life: the middle term of seven years on attempted murder, plus 10 years for the section 186.22 enhancement, plus 25 years to life for the section 12022.53, subdivision (d) enhancement; plus 30 years to life on count two, pursuant to section 186.22, subdivision (b)(4)(A) the middle term of five years plus 25 years to life under the section 12022.53, subdivision (d) enhancement. The court

12

sentenced Washington to a determinate term of five years in state prison, the middle term on count two, plus an indeterminate term of 25 years to life pursuant to the section 12022.53, subdivisions (d) and (e)(1) enhancement. Both defendants filed timely notices of appeal.

## DISCUSSION

## I

## Sufficiency of the Evidence

Washington challenges the sufficiency of the evidence admitted at trial to support his conviction for aiding and abetting a shooting at an inhabited dwelling. Washington claims there is no substantial evidence that he provided Oliver with aid or encouragement with the intent or purpose of facilitating the shooting; no evidence that he said anything or handed anything to Oliver prior to the shooting; no evidence that he was involved in any meeting prior to the shooting in which the shooting was planned; or that he acted as a lookout. According to Washington, the case against him centered on three pieces of evidence: his gang membership, his possession of a gun the night before the shooting, and his fleeing the scene. This evidence admitted at trial and considered by the jury, Washington contends, was insufficient to prove he aided and abetted Oliver when he shot at the house. At most, Washington argues, the evidence shows he was present at the shooting and was in the same gang as Oliver and the others.

**Background**

In reviewing a defendant's challenge to the sufficiency of the evidence, we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence. Substantial evidence is evidence that is credible, reasonable, and of solid value such that a reasonable jury could find the defendant guilty beyond a reasonable doubt. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11 (*Rodriguez*).)

We do not reassess the credibility of witnesses, and we draw all inferences from the evidence that supports the jury's verdict. (*People v. Olguin* (1994) 31 Cal.App.4th

13

1355, 1382.) Unless the testimony of a single witness is physically impossible or inherently improbable, it is sufficient to support a conviction. (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) "We determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.] In so doing, a reviewing court 'presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " (*People v. Edwards* (2013) 57 Cal.4th 658, 715.)

The jury is entitled to draw reasonable inferences based on the evidence (*People v. Livingston* (2012) 53 Cal.4th 1145, 1166), and we must accept all logical inferences the jury might have drawn from the evidence, even if we would have concluded otherwise (*People v. Salazar* (2016) 63 Cal.4th 214, 242). " 'Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt.' " (*People v. Zamudio* (2008) 43 Cal.4th 327, 357-358.) "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict." (*Id*. at p. 357.)

The person who aids and abets in the commission of a crime is a "principal" in the crime and shares the guilt of the actual perpetrator. (*People v. Prettyman* (1996) 14 Cal.4th 248, 259.) " '[A] person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime.' " (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 295-296.)

Among the factors the jury may consider in finding a defendant guilty of aiding and abetting are presence at the crime scene and a defendant's conduct before and after

14

the offense. While a defendant's mere presence at the crime scene or a failure to prevent the crime do not constitute aiding and abetting, these factors may be considered in determining a defendant's culpability. The act required need not be a substantial factor in the offense. Whether a defendant aided and abetted in a crime is a question of fact, and we resolve all conflicts in the evidence and draw all reasonable inferences in favor of the judgment. (*People v. Garcia* (2008) 168 Cal.App.4th 261, 272-273; *People v. Swanson-Birabent* (2003) 114 Cal.App.4th 733, 743-744; *In re Juan G.* (2003) 112 Cal.App.4th 1, 5.)

**Discussion**

Washington's effort to minimize the evidence of his aiding and abetting Oliver's acts fails. Contrary to his assertion, the evidence presented by the prosecution concerning his involvement was not "mere speculation." The evidence of aiding and abetting may be circumstantial. Washington argues there was no evidence that he said anything or handed anything to Oliver prior to the shooting. Nor was there any evidence Washington was involved in any meeting prior to the shooting in which the shooting was planned, or that he acted as a lookout. No doubt a prosecution premised on evidence of a meeting where a shooting was discussed and planned with assigned roles would be more compelling. However, crimes are often sneaky undertakings, structured to conceal evidence of planning. Unlike legitimate businesses, participants in criminal enterprises try to conceal their meetings and plans so that evidence of aiding and abetting must be derived from the circumstances of their interactions and knowledge of their customary practices and habits and history of prior clashes and conflicts rather than evidence of plans and schemes. As this case illustrates, it is difficult to maintain the cooperation of victims and witnesses following gang violence; to require evidence of explicit plans and agreements to commit crimes would make prosecution of all but the direct perpetrators difficult if not impossible.

15

After the offense, the victim readily identified Oliver as the person who shot her and identified Washington as a cohort who was also with Oliver the night before, flashing a revolver of the same description as the one used by Oliver to shoot her. And yet at the trial she remembered very little, could not recall details and her earlier identification could only be revived by her recorded statement. There were no recordings of statements by Washington, but his conduct spoke volumes regarding his complicity. The history of conflict between Guttah Boyz and Gunz Up described by the prosecution expert, including shootings and murders, attests to the violence of Oliver and Washington's gang. The stroll down Bishopgate Court was not an innocent walk down memory lane. As Jackson declared, "they came to funk"—to dispense their venom and hatred via the gun fired by Oliver, a gun of the same description as the gun pulled out by Washington the night before. After the shots were fired, they ran merrily away towards a house occupied by a fellow gang member.

The jury could reasonably infer that the long black revolver in Washington's possession the night before was the long black revolver seen by the neighbor shortly after the shooting and that Oliver used the revolver in the shooting.

Washington argues that even if it could be inferred the gun he possessed the night before was the same gun used in the shooting, "there is still no substantial evidence that [Washington] gave it to [Oliver] for the purpose of committing this particular shooting." Certainly there is no transcript of a conversation between defendants to that effect. But evidence established that defendants belonged to the same gang and the house Oliver shot at was inhabited by a rival gang member. Previously Washington's brother had been shot during a drive-by shooting by suspected rival gang members. Five days before the shooting, Washington and other gang members were involved in a shootout with rival gang members. Just prior to the shooting, the Gunz Up group walked up to Deandre's house and began shooting without any hesitation. Given this sequence of events, the jury

16

could reasonably conclude the gun was an instrument used by Washington and shared with Oliver.

It is also reasonable to conclude that this was all part of a plan, a plan to which Washington subscribed and supported. He should not escape responsibility because he chose not to share his agreement in the manner that members of civilized groups share their agreement to innocent undertakings.

It is not simply Washington's gang membership or his possession of a gun that provides sufficient evidence to find him guilty of aiding and abetting. Instead, it is the interplay of Washington's involvement in the gang, the events preceding the shooting, and his possession of a weapon similar to that identified at the scene and the night before the shooting. Add to these factors Washington's actions immediately following the shooting. Witnesses described the fleeing group of men, which included Washington, as laughing while they ran. Washington's group all fled in the same direction toward a closed cul-de-sac. Silence does not give consent, but nor does it preclude a jury from examining the circumstances of the offense and the conduct of gang members involved in gang wars before and after a criminal shooting and conclude a gang member, here Washington, joined in a plan to walk down a street and direct deadly fire into a residence occupied by members and friends of an opposing gang. The events surrounding the shooting support the inference that it was a planned attack on a rival gang carried out by Oliver using the same revolver displayed by Washington the prior evening. Substantial evidence supports the jury's finding of aiding and abetting.

## II

### Evidence Erroneously Admitted

In his opening brief, Washington argued the court erroneously admitted certain evidence over his objection and to his prejudice. During the course of this appeal, the Supreme Court decided *Sanchez, supra*, 63 Cal.4th 665 concerning the admissibility of hearsay evidence through the testimony of an expert witness. Washington objects to

17

specific testimony provided by the gang expert at trial in his case. Defendants filed supplemental briefs raising points based on the *Sanchez* decision. We address each set of objections in turn.

**Evidence of Prior Criminality**

In his opening brief, Washington contends the trial court erred in allowing evidence of his prior criminal activity. According to Washington, the three incidents admitted into evidence were only marginally necessary for the prosecution and were highly inflammatory.

*Background*

Proceedings Prior to First Trial

Prior to the first trial, the prosecution moved to admit evidence of 29 criminal incidents between the G-Mobb/Guttah Boyz/Starz Up street gangs and the FAB/Gunz Up street gangs between 2008 and the date of the shooting. Oliver filed a motion to sever his jury trial from Washington and/or exclude evidence of the 29 prior gang incidents. Oliver argued the incidents should be excluded because they were cumulative and prejudicial.

Washington also filed motions in limine. In one of his motions, Washington requested an Evidence Code section 402 hearing on the issue of the gang-related conduct. Washington argued the incidents posed a great risk of the admission of inflammatory and irrelevant evidence.

The court held an Evidence Code section 402 hearing. The 29 incidents were more accurately described as 26 incidents. At the hearing the gang expert, Detective Saario, did not detail all 26 incidents but provided a few examples of those incidents. Detective Saario explained the 26 incidents were relevant to show that crimes between the gangs only took place when the gang members were in the company of fellow gang members. The court found all the incidents admissible, finding the evidence probative on the issues of motive and intent and not unduly prejudicial.

18

In addition, at the hearing, the prosecution provided details of a jail assault involving Washington in August 2011. The prosecution argued the assault, which also involved an attempted or completed sexual penetration of the victim, was committed in association with Underworld Zilla and Blood members after one of the victims tried to stick up for the other, a perceived sign of disrespect by the gang members. The prosecution agreed to sanitize the incident by removing any reference to sexual penetration. Detective Saario explained that gang members affiliated with the Bloods who go to prison side with the Zilla gang. Such a prison assault benefits the individual who carries out the assault, his street gang, and the Zillas. Neither of the two assault victims were identified as members of Guttah Boyz, G-Mobb, or Starz Up.

Defense counsel agreed to submit on the issue provided the prosecution redacted the sexual component of the assault. The trial court found the incident proposed for redaction admissible since the incident was probative of Washington's commitment to the gang, and found the danger of prejudice to be "virtually nonexistent compared to the probative value here."

Proceedings Following Mistrial

After the first trial resulted in a mistrial, retrial began. Prior to the second trial, the court stated that all of the in limine evidentiary objections and rulings made during the first trial were deemed to have been raised and made for the second trial. The court held that any previous objections made by the parties at the first trial need not be renewed at the second trial and would be preserved for appellate review. The court invited the parties to present additional argument and any new issues that were not presented at the first trial. The prosecutor stated he had become aware of several of defendants' gang contacts he was unaware of at the first trial.

During the second trial, the prosecution presented evidence of the September 2009 shootout at Nedra Court, the August 2011 jail assault, and a burglary by Washington in May 2009. On appeal, Washington objects to the admission of these three incidents.

19

*May 2009 Burglary*

In May 2009 officers responded to a report of a burglary in progress. When they arrived, officers found several people carrying property out of the residence. The officers confronted the individuals, who fled. Officers surrounded the property, and Washington's brother and James Hamilton were detained. Hamilton told officers "Skeet" was also involved. Skeet was later identified as Washington. Washington's brother was a member of Gunz Up. A witness identified Washington as the person they saw breaking into the residence.

*September 2009 Shootout*

A shootout between Gunz Up and Guttah Boyz gang members took place at Nedra Court in September 2009. Emory Allen, affiliated with Gunz Up, and Jaren Jones lived together on Nedra Court. Jackson, affiliated with G-Mobb, also lived on the court. Previously, Jones associated with Gunz Up but had begun hanging around G-Mobb members. Gunz Up members had tagged Nedra Court with numbers associated with the gang and considered it their turf.

The day of the shooting, Washington, his brother, and Oliver visited Allen on Nedra Court. Jones told Allen he was calling friends to come over. Allen knew the friends were members of the Guttah Boyz gang, and he and Jones argued. Jackson came out to see what was going on and saw Jones making a call.

Timothy Barksdale, a Guttah Boyz member, arrived with a gun and shooting broke out between Guttah Boyz and Gunz Up. Washington and Allen were known to have had guns prior to the shootout for the Gunz Up gang, and Allen and Winters had guns for the Guttah Boyz gang. Winters, who was later associated with C.T. and Jackson, was shot in the altercation.

*August 2011 Jail Assault*

In the county jail, Marquis Greenwood, a member of the Zilla gang, acted disrespectfully toward another man, Lorenzo Mays. Donell Pruitt came to May's defense

and told Greenwood to leave him alone. Greenwood responded that "his crew" would take care of business. Subsequently, Mays and Pruitt were attacked by members of the Bloods and Zillas. The attackers entered Mays' and Pruitt's jail cells while another gang member stood watch. Washington took part in the assault.

### *Discussion*

Washington objects to the admission of these three prior incidents, arguing their admission was "unnecessary, cumulative, and highly prejudicial." Washington contends these prior incidents were only marginally necessary to the prosecution's case given the abundance of other evidence of his gang involvement and were highly inflammatory as propensity evidence. Therefore, Washington argues the court abused its discretion in admitting the three incidents. In the alternative, he contends counsel performed ineffectively in failing to object to the evidence.

Under Evidence Code section 352, the trial court has the discretion to determine the admissibility of evidence, weighing the probative value of that evidence against its prejudicial impact. We will not disturb the court's exercise of its discretion unless we find the court exercised that discretion in an arbitrary, capricious, or patently absurd manner that resulted in a miscarriage of justice. (*Rodriguez, supra*, 20 Cal.4th at pp. 9-10.)

We review the trial court's decision to admit evidence of gang activity for such an abuse of discretion. (*People v. Brown* (2003) 31 Cal.4th 518, 547.) Gang evidence is admissible if relevant to prove motive and opportunity. In addition, such evidence is relevant and admissible when the underlying crime is gang motivated. (*People v. Williams* (1997) 16 Cal.4th 153, 193; *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1167.) However, gang evidence cannot be used by the jury to improperly infer that the defendant has a criminal disposition because of the membership in the gang. (*People v. Champion* (1995) 9 Cal.4th 879, 922.)

21

Washington acknowledges that in order to prove the gang enhancement allegation, the prosecution must prove that Gunz Up and FAB are criminal street gangs engaged in a violent rivalry with Guttah Boyz and G-Mobb, and that Washington and Oliver were members of the gang. However, Washington contends the three incidents he challenges were only marginally necessary to the prosecution's case and highly inflammatory, resulting in an abuse of discretion on the part of the trial court.

We consider each incident in turn. The trial court found the September 15, 2009 shootout probative on the issue of motive and intent. Washington concedes the prosecution was required to demonstrate that the Gunz Up gang engaged in a pattern of criminal activity. However, the evidence that the gang engaged in criminal activity was overwhelming and "it was simply unnecessary for the prosecution to introduce into evidence an incident in which [Washington] himself was the alleged perpetrator." Washington also concedes the September 15, 2009 shootout's probative value but again argues the evidence was cumulative and highly prejudicial since he was the alleged shooter.

The September 15, 2009 shootout took place between Gunz Up and Guttah Boyz gang members and occurred just five days before the shooting in the present case. The shootout involved the same two rival gangs, and many of the same individuals, who clashed in this case and took place in an area of town that Gunz Up members considered their turf. Given the cast of characters, the rivalry over turf, and the timeliness of the prior shootout, this evidence was highly probative of the motive for Gunz Up members to attack Guttah Boyz gang members just five days later. We cannot find the trial court erred in finding the probative value of the September 15, 2009 shootout outweighed any prejudicial impact.

The trial court found the May 7, 2009 burglary admissible because it would support "an opinion that Detective Saario would have that these two gentlemen are both gang members, heavy duty gang members with lengthy involvement with the gang."

22

Again, Washington does not dispute the probative value of the incident, but instead argues his role in Gunz Up was virtually undisputed. Washington points out that the prosecution introduced multiple photographs of Washington giving gang signs and his gang tattoos, evidence of his gang contacts and Detective Saario's opinion that Washington was a validated member of Gunz Up. Therefore, the prosecution did not need to introduce the May 7, 2009 burglary to convince the jury he was an active member of Gunz Up.

The May 7, 2009 burglary established both Washington's commitment to the Gunz Up gang and his participation in gang activities. As Washington notes, the prosecution presented other evidence of Washington's commitment to the gang, but the evidence of Washington flashing gang signs, sporting tattoos, and admitting gang membership pales in comparison to an incident that Washington perpetrated with and for fellow gang members. Washington argues this evidence suggests that if he committed crimes in the past, he is more likely to have been involved in the charged offense, an impermissible use of propensity evidence. We disagree.

In order to prove a pattern of criminal gang activity, the prosecution is not prohibited from introducing evidence of the defendant's misconduct on other occasions. (*People v. Tran* (2011) 51 Cal.4th 1040, 1046.) "The prosecution cannot be compelled to ' "present its case in the sanitized fashion suggested by the defense." ' " (*Id.* at p. 1049.) The prosecution introduced the 2009 burglary as evidence of Washington's commitment to the gang and his participation in gang activities. Although the probative value of the evidence "inevitably decreases with each additional offense, while its prejudicial effect increases" (*ibid.*), here the 2009 burglary was extremely probative of Washington's willingness to be involved in a pattern of gang activity and was not outweighed by its potential prejudicial impact.

The trial court found the August 20, 2011 jail assault was also probative of Washington's "commitment to the gang." Washington posits the same objection to the

23

inclusion of this evidence: it is both cumulative and overly prejudicial. However, the evidence of Washington's participation in a gang-related crime that occurred after the charged crimes is extremely probative of the level of his participation in gang activities. Such evidence provided support that Washington was motivated by gang loyalty to aid and abet the shooting in the present case. Again, the trial court did not err in finding the probative value of the jail assault outweighed its prejudicial impact.

**People v. Sanchez**

Following the trial and after the close of briefing on appeal, the Supreme Court decided *Sanchez, supra*, 63 Cal.4th 665. The *Sanchez* case changed the rules with respect to the admissibility of hearsay evidence relied on by experts to explain the basis for expert opinion. In *Sanchez*, the defendant was convicted of drug and firearm offenses with attached gang enhancements (§ 186.22, subd. (b)(1)) as well as the substantive offense of active gang participation (§ 186.22, subd. (a)). (*Sanchez*, at p. 671, fn. 1.) On appeal, the defendant challenged the gang expert's testimony about five prior contacts he had with police. Though his knowledge about the contacts was derived solely from reading police reports, the expert was permitted to testify about the information described in the reports to explain the basis of his opinion that the defendant was a gang member and committed the charged offenses for the gang's benefit. Consistent with prior authority, the *Sanchez* jury was instructed that the testimony was not admitted for its truth but only to explain the basis for the expert's opinion.

The Supreme Court reversed prior authority and announced a new rule: "If an expert testifies to case-specific out-of-court statements to explain the bases for his opinion, those statements are necessarily considered by the jury for their truth, thus rendering them hearsay" and thus inadmissible unless "properly admitted through an applicable hearsay exception." (*Sanchez, supra*, 63 Cal.4th at p. 684.)

"[I]mproper admission of hearsay may constitute state law statutory error" (*Sanchez, supra*, 63 Cal.4th at p. 698), which would ordinarily be assessed under *People*

24

*v. Watson* (1956) 46 Cal.2d 818 (*Watson*). That test inquires whether "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Id.* at p. 836.) However, if the improperly admitted hearsay is also testimonial within the meaning of the high court's confrontation clause jurisprudence (see, e.g., *Crawford v. Washington* (2004) 541 U.S. 36, 68-69 (*Crawford*)), the error is assessed under the federal constitutional standard of *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*), which requires any error to be harmless beyond a reasonable doubt. (See *Sanchez*, at p. 698.)

Notwithstanding the new rule, general testimony about a gang's behavior, history, territory, and general operations is usually admissible. (See *Sanchez, supra*, 63 Cal.4th at p. 698.) The same is true of the gang's name, symbols, and colors. This background information can be admitted through an expert's testimony, even if hearsay, if there is evidence that it is considered reliable and accurate by experts on the gang. Much of Detective Saario's testimony fell into this category.

As an alternative to a hearsay exception, the Supreme Court has indicated "the [hearsay] evidence can be admitted through an appropriate witness and the expert may assume its truth in a properly worded hypothetical question in the traditional manner." (*Sanchez, supra*, 63 Cal.4th at p. 684.)

In response to a hypothetical setting forth the facts surrounding the shooting of C.T., Detective Saario testified such a shooting benefits the gang because it instills fear in the rival gang and the surrounding community. The aggressor gang gains respect from both its rivals and own gang members as a result of the shooting.

In supplemental briefing, Washington, joined by Oliver, challenges testimony provided by Saario as case specific hearsay. Some of the testimony had already been challenged in the opening brief on grounds of relevance and undue prejudice.

    (1)   Testimony that a witness identified Washington as a participant in a home burglary on May 7, 2009.

(2) Testimony that Washington was involved in an assault in the Sacramento County jail in 2011, testimony apparently based on a report from other law enforcement officers.

(3) Testimony regarding a gang information report dated May 19, 2000, authored by "POP officers," who searched Jamarr Washington's residence pursuant to a search warrant, that among photographs discovered during the search was a photograph of 12 individuals throwing Gunz Up gang signs. Defendants were two of the individuals. In the same report, Washington was identified in a photograph on a social media Web site throwing up Gunz Up gang signs. Washington asserts "it is entirely possible, if not probable, that the search was conducted as part of the investigation into one of the many shootings that occurring during that time period" and thus the report was testimonial, in which case the confrontation clause is implicated.

(4) Testimony by Detective Saario based on information provided to him by officers who conducted a search of Washington's residence on May 20, 2009, during which Washington and his brother told officers about the feud between Gunz Up and Starz Up. Washington argues the conversations may have been part of an investigation into a crime and thus were testimonial.

(5) Testimony based on a July 3, 2009 report prepared by POP officers that Washington was among a group of Gunz Up members loitering near an apartment complex.

(6) Testimony by Detective Saario that on April 23, 2009, after some unnamed officers were able to stop a vehicle that initially evaded their pursuit, Washington admitted he and his brother were Gunz Up members.

(7) Testimony by Detective Saario that unnamed "officers" observed Washington's image in a photograph on a Gunz Up member's social media page.

26

(8) Testimony by Detective Saario that "officers" monitoring a party saw Washington at the party.

(9) Testimony by Detective Saario that "officers" spoke with a group that included Washington, and several members of the group told the officers they were Gunz Up members, showed gang signs and related the history of the gang.

Oliver also challenges Detective Saario's testimony that Oliver was at the shooting at Nedra Court. The testimony was apparently based on a report of the incident. On cross-examination by Oliver's counsel, Detective Saario disclaimed any direct knowledge of the incident, but confirmed the statement by Oliver's counsel that: "Basically the report indicates he's hiding in the garage and looking out the crack of the garage and seeing shell casings fall?" Oliver also joins in the challenge to Detective Saario's testimony regarding the May 19, 2000 POP officers' report and the July 3, 2009 POP officers' report.

*Discussion*

In summary, the *Sanchez* objections raised by defendants challenge evidence concerning their gang membership. However, defendants never contested their membership in Gunz Up. As set forth in Washington's opening brief, "[Defendant] does not dispute the sufficiency of the evidence demonstrating the feud between these gangs or even his membership in Gunz Up." Rather, Washington argued " 'Membership in an organization does not lead reasonably to any inference as to the conduct of a member on a given occasion.' " This case is unlike those in which the defendants disclaimed gang membership and hearsay testimony by an expert was critical in proving membership despite the defendants' denials.

The parties argue vociferously as to whether the erroneous admission of the challenged hearsay should be analyzed for prejudice under the standard set forth in *Chapman, supra*, 386 U.S. at p. 24, which requires reversal unless the error was harmless

beyond a reasonable doubt, or under the more relaxed state evidentiary error standard set forth in *Watson, supra*, 46 Cal.2d 818, which requires the defendant on appeal to show that it was reasonably probable that the result would have been different had the specific item of evidence not been presented before the jury. *Chapman* is the appropriate standard if the hearsay was testimonial within the meaning of *Crawford, supra*, 541 U.S. 36 and thus violative of defendants' right of confrontation. The People insist defendants fail, in all but a few instances, to establish the erroneously admitted hearsay was testimonial and urge us to reject the rule urged by defendants that when both testimonial and nontestimonial hearsay is received, the cumulative effect should be assessed under *Chapman*.

Defendants cite *People v. Iraheta* (2017) 14 Cal.App.5th 1228, 1252-1255 in support of such a rule. But in *Iraheta* the question of whether the defendant was a gang member was hotly contested. The defendant denied being a gang member. He never admitted such membership to law enforcement. Indeed, he consistently denied being a gang member and presented considerable evidence undercutting the prosecution's evidence. The prejudice of hearsay evidence of his gang membership, admitted in violation of *Sanchez*, was easy to find, whether testimonial or otherwise. Here, Washington never denied his gang membership. Indeed, he objected to some of the gang evidence as excessive and cumulative given his admission of gang membership and other evidence of his gang involvement.

The erroneous admission of hearsay testimony establishing his gang membership was cumulative and not prejudicial under either *Watson* or *Chapman*. Here, we have the testimony of the victim in this case, Washington's presence at the shooting, and Washington walking down the street with a shooter who used a gun that was arguably the same gun displayed by Washington the night before. All of this was far more compelling than Detective Saario's testimony about his gang membership.

28

***Oliver's Prejudice Claim***

Oliver's claim of prejudice from the admission of case specific hearsay also fails. The victim had met Oliver on previous occasions. She saw him and Washington walking down the street together. She saw him pull out a gun similar to the gun she saw in Washington's hands the night before. When shown a photograph of Oliver after the shooting she burst into tears and identified the photograph as that of the person who shot her. Jackson also identified Oliver as the person in front of the group walking down Bishopgate Court. Jackson also knew Oliver from previous friendly encounters. Oliver made eye contact with him and shook his head back and forth as if to warn him of the violence to come. Jackson knew the object of the group; not just talk but they were coming for "funk."

The Gunz Up gang membership of defendants though undisputed, was relevant. Their disdain for Guttah Boys/Starz Up gang members provided a motive for the otherwise senseless violence. The shooting in this case involved the home of Deandre, an individual who was affiliated with Guttah Boyz. At the time of the shooting, Deandre and two other males, who were affiliated with Guttah Boyz, were sitting outside his Bishopgate Court residence. Gang expert Detective Saario testified that Gunz Up and Guttah Boyz are enemies and that Guttah Boyz and Starz Up are subsets of the same umbrella gang, G-Mobb. Additionally, tensions were high between Gunz Up and Guttah Boyz at the time of the Bishopgate Court shooting as there had just been a shooting between the two gangs at Nedra Court a few days before and Oliver was also at the Nedra Court shooting.

The eyewitness testimony and the testimony regarding the hostility between Gunz Up and Guttah Boyz provided strong evidence that Oliver was the shooter at Bishopgate Court and was guilty of the crimes for which he was convicted irrespective of the challenged evidence. The same evidence supported the allegations against his fellow gang member, Washington.

29

Writings found when Detective Saario and others searched Oliver's bedroom illustrate the level of hostility felt by Oliver. Detective Saario testified to recovered writings Oliver wrote: "If we from smutta . . . Nigga, I'm going to split his shit. . . . Dat Nigga hella fucking soft and he be aiming to miss. I aim to hit dat Nigga just a lil ass bitch, yeah, he be yapping out da mouth but he ain't waken up shit." According to Detective Saario, "smutta" is a disrespectful term for "Guttah" and the phrase "I'm going to split his shit" refers to shooting someone.

Detective Saario testified the writing also stated: "It's hit squad gunna Boyz. I be a captain. I'm Little Diddy Mackin. We can get this shit cracking." The writing continued: "Letting these Stars Down Niggas may pump you up to get slumped. Little Niggas you get found in the trunk. You Niggas ain't worth killing cause you Niggas be punks." Detective Saario testified another writing found in Oliver's bedroom, stated: "Bread over bitches my nigga. That's what we claim. Fucking with this BOB shit. These hoes, they getting played fucking with the squad. These niggas, they sprayed. 53 hunnit my nigga. That's where we stay, We Bounce Out Boys. My nigga, this ain't no game." Detective Saario opined that "sprayed" in this context referred to "shooting multiple rounds." He also believed "53 hunnit" referred to 5300 Mack Road, the Aspen Apartments, and that location was associated with Gunz Up.

Further: "A lot of niggas acting hard but they really be soft. I'm a squad made nigga. I ain't taking a loss. . . . I'm little Diddy Mackn bra. On the strip pulling trigger -- or on the strip pulling nighters. We be thizzin in the shit. And when them niggas slide through, Ima empty the clip." Detective Saario believed that the reference to "squad" was significant because Gunz Up called themselves "a squad." Additionally, the detective believed that "little Diddy Mackn" referred to defendant Oliver. Oliver's attitude was reflected in his writings and actions.

Their words and actions, considered in the context of an ongoing gang war between two gangs, provided far more compelling evidence of the guilt of Washington

and Oliver than any of the hearsay evidence provided by Detective Saario of their gang membership.

## Ineffective Assistance of Counsel

Washington asserts that defense counsel performed ineffectively in failing to object to hearsay evidence that Washington and his brother dropped off Deandre at his house on a previous occasion. Defendants also label as ineffective defense counsel's failure to object to the prosecutor's comments during closing argument.

To establish ineffective assistance of counsel, a defendant must show counsel's performance was deficient and fell below an objective standard of reasonableness, and it is reasonably probable that a more favorable result would have been reached absent the deficient performance. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688.) A reasonable probability is a "probability sufficient to undermine confidence in the outcome." (*Id*. at p. 694.)

**Hearsay Evidence**

During a recorded interview with Detective Saario, Jackson described the actions of the shooter and the rest of the group outside Deandre's house just prior to the shooting. Jackson told Detective Saario "everybody" looked at Deandre's house. Jackson explained that two individuals knew Deandre because they went to school with him and had dropped him off at his house in the past.

At trial the prosecutor asked Jackson:

"Q. Also, a point that you mentioned during the tape, you said that the two people had actually dropped off Deandre at his home because they went to school with him, do you remember that part?

"A. Yeah.

"Q. We were just looking at that?

"A. Yeah.

31

"Q. When you said the two people, you pointed at something on the tape, do you remember that?

"A. Yeah.

"Q. Were the two people you were pointing at, were they a photograph of Isaac Washington and Isiah Washington?

"A. Yeah.

"Q. Were those the two guys you meant?

"A. Huh?

"Q. Were these the two guys that you meant when you said these two guys dropped Deandre off at his house?

"A. Yeah.

"Q. How do you know they dropped Deandre at his house, or you knew where he lived?

"A. Deandre told me."

*Discussion*

Washington contends the information that he and his brother previously dropped off Deandre at his house was inadmissible hearsay. According to Washington, these hearsay statements implied Washington was more than just a bystander at the shooting, but instead was the person who directed the shooter to the house. Defense counsel's failure to object to this testimony, Washington contends, constitutes ineffective assistance of counsel.

Under Evidence Code section 1200, "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated" is inadmissible as hearsay, except as otherwise provided by law. (Evid. Code, § 1200, subds. (a), (b).) Deandre's statement to Jackson, which Jackson repeated at trial, was inadmissible hearsay under Evidence Code section 1200.

Washington argues there was no tactical reason for defense counsel's failure to object to Jackson's testimony. According to Washington, the inadmissible remarks flew in the face of the defense argument that Washington had no role in the shooting: "If the jury were to accept what Deandre told [Jackson] as true—that [Washington] knew exactly where Deandre lived—and if the jury were to leap to the conclusion that the shooter learned where Deandre's house was from [Washington], then [Washington] would be guilty as an aider and abettor." Therefore, there was no conceivable tactical reason not to object to Deandre's out-of-court statement.

We disagree. Defense counsel, faced with Deandre's statement, may well have decided not to object in order to minimize any potential impact of the statement. The brief reference to Washington and his brother dropping off Deandre at his house would have been magnified had defense counsel objected. We reverse a conviction on the ground of inadequate counsel only if the record discloses defense counsel had no rational tactical purpose for failing to object. (*People v. Frye* (1998) 18 Cal.4th 894, 979-980, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) We do not second-guess defense counsel's difficult tactical decisions in the harsh light of hindsight. (*People v. Scott* (1997) 15 Cal.4th 1188, 1212.)

**Prosecutor's Comments**

During closing argument, the prosecutor stated: "Come into court and tell you the truth? There's no place for that. That makes you a snitch. But you put them someplace where they're in a hospital bed, they don't know they're being recorded, they're in a police station and they don't realize that they're being recorded, and all of a sudden everything changes. We talked a little about the snitching effect, how it applies, and no one wants to be a snitch.

"And the respect and the fear. Because this is all about respect and fear. That's why these things are happening is because of respect and fear. And that fear and respect is what keeps people from coming to court and telling the truth. But, at the end of the

33

day, the idea and question is this:  When is enough going to be enough?  When is it going to stop?  When do we stop shooting each other over nothing?

"The [C.T.s] of the world, despite being crippled -- I can't put it any other way, she doesn't want to come in here and testify.  Antoine Jackson is a Guttah Boy.  He's not interested in that.

"The only way that this stops is if these people are held responsible for the things that they do, for the conduct that they engaged in.  Being held responsible for the lack of respect for human life, theirs and others.  That's the first step.  That's what has to happen."

Later during closing argument, the prosecutor argued:  "No matter what happens in this particular case, gang violence isn't going to go away.  It's not like these men are convicted and all of a sudden there's no more gang wars.  That's just unfortunately, the way it is.  But at least in this case, at least on what happened on September 20th, 2009, at least on that day, there can be justice.  That's what this is about.  This is about on that particular day these men being held responsible for what they did.  And that can only happen one way, and that's if they're found guilty of each and every charge and each and every enhancement because they are guilty beyond all reasonable doubt."

During rebuttal, the prosecutor stated:  "And at the end of the day, both of these men should be convicted of all of these crimes and not because I, as the prosecutor, am standing up here and asking you to convict them.  [¶]  They shouldn't be convicted because you felt bad that a young girl was hit.  They should be convicted for each and every one of these crimes because it's the truth.  They did it.  They're responsible.  And the right thing is that they're held responsible for that because it's the truth.  And, at the end of the day, that's what this is all about, getting to the truth.  And the truth of the matter is they're both guilty, and verdicts that support that will equal justice."

34

*Discussion*

A prosecutor's conduct violates the federal Constitution when it comprises a pattern of conduct so egregious that it infects the trial with such unfairness as to deny the defendant due process. Prosecutorial conduct that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury. (*People v. Samayoa* (1997) 15 Cal.4th 795, 841 (*Samayoa*).)

As a general rule, a defendant must object to prosecutorial misconduct and request an admonishment when the misconduct occurs. (*Samayoa, supra*, 15 Cal.4th at p. 841.) The defendant's failure to object or request an admonition is excused if either it would be futile or an admonition would not have cured the harm caused by misconduct. (*People v. Hill* (1998) 17 Cal.4th 800, 820.)

The prosecution may make fair comments on both the evidence presented and the credibility of witnesses. (*People v. Clark* (1993) 5 Cal.4th 950, 1029, disapproved on another ground in *People v. Doolin, supra*, 45 Cal.4th at p. 421, fn. 22.) However, the prosecution may not suggest the existence of facts outside of the record, misstate the evidence, or appeal to the jury's sympathy, passion, or prejudice. (*People v. Davis* (2005) 36 Cal.4th 510, 550; *People v. Benson* (1990) 52 Cal.3d 754, 794-795; *People v. Fields* (1983) 35 Cal.3d 329, 362.)

On appeal, the defendant bears the burden of affirmatively demonstrating the prosecutor's misconduct. (*People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573.) Defendants contend the arguments cited above from the prosecutor's closing constitute misconduct, and therefore defense counsel performed ineffectively in failing to object. In support, defendants rely on a pair of federal cases: *U.S. v. Solivan* (6th Cir. 1991) 937 F.2d 1146 (*Solivan*) and *U.S. v. Johnson* (8th Cir. 1992) 968 F.2d 768 (*Johnson*). In these cases, defendants argue, the prosecution committed misconduct by implying the jurors could help with the war against drugs by finding the defendants in those particular

cases guilty. Defendants claim the prosecution in the present case committed the same misconduct, and defense counsel should have objected to the argument.

In *Solivan*, during closing argument the prosecutor stated: "*What you're listening to is a wholesale distributor of narcotics, cocaine discuss her business affairs* and complain about her busy schedule, the lack of good product and the trouble she's having getting this stuff up here now. And I'd submit to you folks, that *she's been caught now. And I'm asking you to tell her and all of the other drug dealers like her*—(defense counsel's objection and Court's response omitted)—[t]hat *we don't want that stuff in Northern Kentucky and that anybody who brings that stuff in Northern Kentucky and . . . .*" (*Solivan*, *supra*, 937 F.2d at p. 1148.)

The court found these comments constituted misconduct since they were "designed, both in purpose and effect, to arouse passion and prejudice and to inflame the jurors' emotions regarding the War on Drugs by urging them to send a message and strike a blow to the drug problem." (*Solivan, supra*, 937 F.2d at p. 1153.) In addition, the court found: "The prosecutor in the instant case went beyond stating the obvious, and went so far as to urge the jury to send a message to the community, to defendant and 'all of the drug dealers like her' by convicting defendant. The prosecutor suggested to the jury that convicting defendant would help keep its community in Northern Kentucky free of the drug trade by sending the message that 'we don't want that stuff in Northern Kentucky and that anybody who brings that stuff . . .' presumably would be convicted just like defendant in this case." (*Id*. at p. 1155.)

In *Johnson*, another case involving drugs, the prosecutor stated: "[The defense's attorney] says your decision to uphold the law is very important to his client. Your decision to uphold the law is very important to society. You're the people that stand as a bulwark against the continuation of what Mr. Johnson is doing on the street, putting this poison on the street." (*Johnson, supra*, 968 F.2d at p. 769.) The court found these comments unduly inflammatory: "Clearly, the drug problem is a matter of great concern

in this country today.  This court is sympathetic to prosecutors' vigorous efforts to prosecute participants in the drug trade.  However, we are in agreement with the precedent cited above that the pressing nature of the problem does not give prosecutors license to encumber certain defendants with responsibility for the larger societal problem in addition to their own misdeeds.  We conclude that by urging the jury to act as a 'bulwark against . . . putting this poison on the streets,' the prosecutor in this case appealed to the jurors to be the conscience of the community in an improper and inflammatory manner." (*Id*. at p. 771.)

According to defendants here, the prosecutor referenced the larger problem of gang violence, asking the jury, "When is enough going to be enough?  When is it going to stop?  When do we stop shooting each other over nothing?"  Defendants also note the prosecutor argued:  "The only way this stops is if these people are held responsible for the things that they do, for the conduct that they engaged in.  Being held responsible for the lack of respect for human life, theirs and others.  That's the first step.  That's what has to happen."  Defendants argue, "This is what the prosecutors in *Solivan* and *Johnson* did, the only difference being the subject matter.  The prosecutor implied that the jury could begin to have an effect on the societal problem of gang violence by holding [Washington] and Oliver responsible for what they did.  Accordingly, the prosecutor committed misconduct."

We disagree.  Instead, we find the prosecution's comments have more in common with those found not to constitute misconduct in *People v. Adanandus* (2007) 157 Cal.App.4th 496 (*Adanandus*).  In *Adanandus*, a murder case, the prosecutor argued: " '[W]ith your verdicts you cannot bring Joseph Wills back to his mother, and you cannot change any of the events that [defendant] put into place when he started this motion on April 19, 2005.  [¶]  What you can do is restore justice to that street.  That street on that day was without justice. . . .  [¶] . . . [¶]  You, as jurors in this case, have taken an obligation and oath to uphold the law.  Believe in the law.  Restore the law to the 2500

37

block of 65th Avenue, those are the only true and correct verdicts in this case, and I am confident and believe that you'll return those verdicts.' " (*Id*. at pp. 511-512.)

The *Adanandus* court found no misconduct:  "The prosecution's references to the idea of restoring law and order to the community were an appeal for the jury to take its duty seriously, rather than efforts to incite the jury against defendant.  Thus, they were not misconduct." (*Adanandus, supra*, 157 Cal.App.4th at p. 513.)  Here, the prosecutor argued to the jury:  "The only way that this stops is if these people are held responsible for the things that they do, for the conduct that they engaged in.  Being held responsible for the lack of respect for human life, theirs and others.  That's the first step.  That's what has to happen."  Despite defendants' protestations to the contrary, the prosecutor's comments were not inflammatory or designed to arouse prejudice.  As in *Adanandus*, the prosecutor asked the jury to hold defendants responsible for their actions, not for the actions of others.  Nor did the prosecution connect defendants' actions with a societal evil or suggest that convictions would reduce future crime.  Instead, the prosecutor told the jury that convicting defendants would not halt gang warfare, but instead would achieve justice for the crimes committed on September 20, 2009.

Since the prosecution did not commit misconduct during argument, defense counsel did not perform ineffectively in failing to object.[3]

## IV

## Cruel and Unusual Punishment

Defendants argue their sentences constitute cruel and unusual punishment under the Eighth Amendment to the United States Constitution because they amount to de facto life-without-parole sentences.

---

[3]  Since we find no error, we do not address Washington's cumulative error argument.

**Background**

Oliver was 17 years old when he committed the attempted murder and shooting at an inhabited dwelling. The court sentenced Oliver to a determinate prison term of 17 years plus an indeterminate term of 55 years to life. Washington was 16 years of age when he committed the crime of shooting at an inhabited dwelling. The court sentenced Washington to a determinate term of five years plus an indeterminate term of 25 years to life. The People calculate Washington will be eligible for parole when he is 41 or 42 years of age.

**Discussion**

Beginning with *Graham v. Florida* (2010) 560 U.S. 48 (*Graham*), followed by *Miller v. Alabama* (2012) 567 U.S. 460 (*Miller*), and concluding with *People v. Caballero* (2012) 55 Cal.4th 262 (*Caballero*) and *Franklin, supra*, 63 Cal.4th 261, the United States and California Supreme Courts explored the constitutional limits of government's power to punish minors tried as adults. In response to these decisions, the California Legislature enacted Senate Bill No. 260 (2013-2014 Reg. Sess.), adding section 3051, which provides minors sentenced to a determinate term of years or a life term an opportunity to prove their rehabilitation and secure release on parole after serving a prescribed term of confinement.

In the wake of these decisions and the resulting legislation, we invited the parties to flesh out the issue and they have provided differing interpretations of the interaction between section 3051 and the concerns expressed in *Caballero*, *Graham*, and *Miller*. We also asked the parties to address what impact, if any, section 1170, subdivision (d)(2)(A) had on defendants' sentencing.

### *Section 1170, Subdivision (d)(2)(A)*

Section 1170, former subdivision (d)(2)(A)(i) stated: "When a defendant who was under 18 years of age at the time of the commission of the offense for which the defendant was sentenced to imprisonment for life without the possibility of parole has

39

served at least 15 years of that sentence, the defendant may submit to the sentencing court a petition for recall and resentencing." Since the parties' supplemental briefing on the statute, subdivision (d)(2)(A)(i) has been redesignated as subdivision (d)(1)(A) and now reads "When a defendant who was under 18 years of age at the time of the commission of the offense for which the defendant was sentenced to imprisonment for life without the possibility of parole has been incarcerated for at least 15 years, the defendant may submit to the sentencing court a petition for recall and resentencing." (Stats. 2021, ch. 719. § 2.)

Oliver contends that this resentencing provision, in combination with section 3051, violates his right to equal protection. According to Oliver, this combined statutory scheme "allows [life without parole] juvenile offenders to petition for release of parole 10 years before non-[life without parole] juvenile defendants with sentences of 25 or more years to life." Washington contends, under the equal protection clause and pursuant to section 1170, former subdivision (d)(2)(A), he is entitled to petition for recall and resentencing after serving 15 years of his sentence.

Equal protection under the state and federal Constitutions requires that persons similarly situated must receive like treatment under the law. To establish an equal protection claim, an individual must show that the state has adopted a classification that affects two or more similarly situated groups in an unequal manner. (*In re Eric J.* (1979) 25 Cal.3d 522, 531.) Equal protection does not require that all persons be dealt with identically, but it does require that any distinction have some relevance to the purpose for which the classification is made. (*Baxstrom v. Herold* (1966) 383 U.S. 107, 111.) Unless the statute questioned involves a suspect class or a fundamental right, the challenged provision need only meet minimal equal protection standards and is reviewed under the rational basis standard. Under this standard, the classification must be rationally related to a legitimate governmental purpose. (*People v. Wilkinson* (2004) 33 Cal.4th 821, 836; *Board of Supervisors v. Local Agency Formation Com.* (1992) 3 Cal.4th 903, 913.)

Defendants contend that juvenile offenders sentenced to lengthy or de facto life-without-parole terms are similarly situated to juvenile offenders sentenced to life without parole. We disagree. In the present case, defendants received lengthy prison sentences for the commission of a nonhomicide offense. A juvenile sentenced to life without parole must be convicted of a homicide offense; the juvenile must have killed someone. Under the Eighth Amendment, juvenile offenders who commit nonhomicide offenses cannot be sentenced to life without parole. (*Graham*, *supra*, 560 U.S. 48.) Moreover, under section 3051, nonlife-without-parole juvenile offenders such as defendants, whose controlling terms under the statute are 25 years to life, are guaranteed to be eligible for parole no later than their 25th year of incarceration. However, section 3051 does not apply to juvenile offenders sentenced to life without parole. (§ 3051, subd. (h).) Defendants are not similarly situated to life-without-parole juvenile offenders, which dooms their equal protection claim.

### *Section 3051*

Section 3051, subdivision (b)(3) states that a juvenile defendant with a controlling offense of 25 years to life shall be eligible for release on parole by the board during his or her 25th year of incarceration. Here, Oliver's controlling offense was 25 years to life for the firearm enhancement. Therefore, Oliver will be eligible for release on parole during his 25th year of incarceration, when he is approximately 42 years old. *Caballero* requires that a juvenile offender have a meaningful opportunity for release on parole during his or her natural life expectancy. (*Caballero, supra*, 55 Cal.4th at pp. 268-269.) Section 3051 provides Oliver the opportunity for release at age 42, well within his natural life expectancy.

Washington concedes he will not be eligible for parole until he serves 25 years of his indeterminate sentence, which does not begin to be served until he first serves his five-year determinate sentence. However, he argues that under section 3051, subdivision (b)(3), he should be deemed eligible for parole after having served 25 years in the

aggregate. Therefore, once Washington has served 25 years of his aggregate sentence, he should be eligible for a youth parole hearing.

We agree. Section 3051, subdivision (a)(2)(B) states: " 'Controlling offense' means the offense or enhancement for which any sentencing court imposed the longest term of imprisonment." Section 3051, subdivision (b)(3) states: "A person who was convicted of a controlling offense that was committed when the person was 25 years of age or younger and for which the sentence is a life term of 25 years to life shall be eligible for release on parole at a youth offender parole hearing during the person's 25th year of incarceration . . . ."

V

**Remand Issues**

**Senate Bill No. 620**

Defendants seek remand to permit the trial court to exercise its discretion to strike the firearm use enhancements under the amendment to section 12022.53, subdivision (h), enacted by Senate Bill No. 620 (2017-2018 Reg. Sess.) (Stats. 2017, ch. 682, § 2, effective Jan. 1, 2018). The court had no such discretion at the time of trial. Subdivision (h) was later amended to provide: "The court may, in the interest of justice pursuant to Section 1385, and at the time of sentencing, strike or dismiss an enhancement otherwise required to be imposed by this section." (§ 12022.53, subd. (h).)

The People agree that the amendment is retroactive to cases like the present one, which are not yet final. We so held in *People v. Woods* (2018) 19 Cal.App.5th 1080. Remand is required unless "the record shows that the trial court clearly indicated when it originally sentenced the defendant that it would not in any event have stricken [the] enhancement" even if it had the discretion. (*People v. McDaniels* (2018) 22 Cal.App.5th 420, 425; see also *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391; *People v. Franks* (2019) 35 Cal.App.5th 883, 892-893.) In reviewing whether the trial court made such an indication, we consider the trial court's statements and sentencing decisions. (See *People*

42

*v. McVey* (2018) 24 Cal.App.5th 405, 418-419.)  The trial court need not have stated it would not strike the enhancement if it had the discretion to do so.  (*Ibid*.)

More recently, in *People v. Tirado* (2022) 12 Cal.5th 688, the California Supreme Court held that trial courts have discretion to strike a greater section 12022.53 enhancement and impose a lesser included section 12022.53 enhancement whether or not the lesser included enhancement was alleged.  (*Id.* at pp. 692, 697, 700.)

The People agree that remand is appropriate in Washington's case but insist that it would be inappropriate in Oliver's case, even for the purpose of imposing a lesser included enhancement; "doing so would be an idle act that exalts form over substance because it is not reasonably probable the court would impose a different sentence." (*People v. Coelho* (2001) 89 Cal.App.4th 861, 889.)  While the offenses committed by both defendants are serious and deserving of severe punishment, we cannot find *a clear indication* in the record that the trial court would not consider striking or reducing the enhancements in either case.  Accordingly, the matter must be remanded for the trial court to consider exercising its discretion pursuant to Senate Bill No. 620 and under *People v. Tirado*.

**Retroactivity of Proposition 57—Juvenile Transfer Hearing**

Defendants also contend Proposition 57 (as approved by voters, Gen. Elec. (Nov. 8, 2016) eff. Nov. 9, 2016) applies retroactively to this case and requires a remand to the juvenile court for a juvenile transfer hearing.  Defendants were minors at the time of the offenses and were directly charged in adult criminal court.  Proposition 57 became effective while their appeal was pending and amended the Welfare and Institutions Code to eliminate direct filing by prosecutors in adult criminal court.  Minors could still be tried in adult criminal court, but only after a juvenile court judge conducted a transfer hearing to consider various factors such as their age, maturity, intellectual capacity, mental and emotional health, degree of criminal sophistication, prior delinquent history, whether they can be rehabilitated, and the circumstances and gravity of the offense

43

alleged. (Welf. & Inst. Code, § 707, subd. (a).) The People initially argued that Proposition 57 was not intended to apply retroactively and thus did not apply to this case in which trial had been completed in adult criminal court.

In *People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299 (*Lara*), our Supreme Court held: "The possibility of being treated as a juvenile in juvenile court—where rehabilitation is the goal—rather than being tried and sentenced as an adult can result in dramatically different and more lenient treatment. Therefore, Proposition 57 reduces the possible punishment for a class of persons, namely juveniles. For this reason, [the] inference of retroactivity [set forth in In re *Estrada* (1965) 63 Cal.2d 740] applies. As nothing in Proposition 57's text or ballot materials rebuts this inference, we conclude this part of Proposition 57 applies to all juveniles charged directly in adult court whose judgment was not final at the time it was enacted." (*Id.* at pp. 303-304.)

Accordingly, Proposition 57 must be given retroactive effect and thus applies to this case.

There remains the question of remedy where, as here, defendants were tried, convicted, and sentenced in adult criminal court before Proposition 57 took effect. The Supreme Court endorsed the remedy for such cases provided in *People v. Vela*, a Court of Appeal decision:

" 'Here, under these circumstances, Vela's conviction and sentence are conditionally reversed and we order the juvenile court to conduct a juvenile transfer hearing. [Citation.] When conducting the transfer hearing, the juvenile court shall, to the extent possible, treat the matter as though the prosecutor had originally filed a juvenile petition in juvenile court and had then moved to transfer Vela's cause to a court of criminal jurisdiction. [Citation.] If, after conducting the juvenile transfer hearing, the court determines that it would have transferred Vela to a court of criminal jurisdiction because he is "not a fit and proper subject to be dealt with under the juvenile court law," then Vela's convictions and sentence are to be reinstated. [Citation.] On the other hand,

44

if the juvenile court finds that it would *not* have transferred Vela to a court of criminal jurisdiction, then it shall treat Vela's convictions as juvenile adjudications and impose an appropriate "disposition" within its discretion.' " (*Lara, supra*, 4 Cal.5th at p. 310, quoting *People v. Vela* (2017) 11 Cal.App.5th 68, 82 [judgment vacated and cause remanded, reaffirmed at *People v. Vela* (2018) 21 Cal.App.5th 1099].)

We will apply the same remedy here.

**Franklin Remand**

Defendants contend we must order a limited remand under *Franklin, supra*, 63 Cal.4th 261.

Following the sentencing in this case, the United States Supreme Court decided *Miller, supra*, 567 U.S. 460, and the California Supreme Court decided *Caballero, supra*, 55 Cal.4th 262. Both decisions reflected a view that young people are less culpable and have greater prospect of reform. They are less fixed in their character and more capable of change than adults. Childhood trauma, mental illness, peer threats and immaturity can be addressed in time and render them redeemable. In response, the California Legislature passed Senate Bill No. 260 (2013-2014 Reg. Sess.), which became effective January 1, 2014, and enacted various statutes (§§ 3046, subd. (c), 3051, 4801, subd. (c)) to provide a parole eligibility mechanism for reformed juvenile offenders. (*Franklin, supra*, 63 Cal.4th at p. 276.)

Later, the Legislature amended 3051 to expand the rights of youthful offenders to a youth offender parole hearing. (Stats. 2013, ch. 312 (Sen. Bill No. 260), § 4; amended by Stats. 2015, ch. 471 (Sen. Bill No. 261), § 1, eff. Jan. 1, 2016; Stats. 2017, ch. 675 (Assem. Bill No. 1308), § 1, eff. Jan. 1, 2018; Stats. 2017, ch. 684 (Sen. Bill No. 394), § 1.5, eff. Jan. 1, 2018; Stats. 2019, ch. 577 (Assem. Bill No. 965), § 2, eff. Jan. 1, 2020.)

The Legislature recognized that "The purpose of this act is to establish a parole eligibility mechanism that provides a person serving a sentence for crimes that he or she committed as a juvenile the opportunity to obtain release when he or she has shown that

45

he or she has been rehabilitated and gained maturity, in accordance with the decision of the California Supreme Court in *People v. Caballero* (2012) 55 Cal.4th 262 and the decisions of the United States Supreme Court in *Graham v. Florida* (2010) 560 U.S. 48, and *Miller v. Alabama* (2012) 183 L.E.2d 407. . . . It is the intent of the Legislature to create a process by which growth and maturity of youthful offenders can be assessed and a meaningful opportunity for release established." (Stats. 2013, ch. 312, § 1.)

The Supreme Court in *Franklin* held that the young defendant must have had sufficient opportunity in the trial court "to put on the record the kinds of information that sections 3051 and 4801 deem relevant at a youth offender parole hearing." (*Franklin, supra*, 63 Cal.4th at p. 284.) "If the trial court determines that [defendant] did not have sufficient opportunity, then the court may receive submissions and, if appropriate, testimony pursuant to procedures set forth in section 1204 and rule 4.437 of the California Rules of Court, and subject to the rules of evidence. [Defendant] may place on the record any documents, evaluations, or testimony (subject to cross-examination) that may be relevant at his eventual youth offender parole hearing, and the prosecution likewise may put on the record any evidence that demonstrates the juvenile offender's culpability or cognitive maturity, or otherwise bears on the influence of youth-related factors." (*Ibid.*)

The sentencing hearings for Oliver and Washington were conducted prior to the decision in *Miller* and prior to the effective date of section 3051. It is doubtful they "had sufficient opportunity to put on the record the kinds of information that sections 3051 and 4801 deem relevant at a youth offender parole hearing." (*Franklin, supra*, 63 Cal.4th at p. 284.) We thus agree with the People and defendants that this case should be remanded for the trial court to afford defendants that opportunity if it has not been provided.

**Assembly Bill No. 333**

We granted Oliver permission to file a supplemental brief addressing amendments to section 186.22 effected by the enactment of Assembly Bill No. 333 (2021-2022 Reg.

46

Sess.). Thereafter Washington filed a joinder, the People responded with a supplemental brief and on April 18, 2022, Oliver filed a supplemental reply brief.

When defendants were convicted section 186.22 made it a crime to actively participate in a criminal street gang, and provided for enhanced punishment when a defendant is convicted of an enumerated felony committed "for the benefit of, at the direction of, or in association with any criminal street gang."

The trial court sentenced Washington to a determinate term of five years (middle term on count two), plus an indeterminate term of 25 years to life pursuant to the section 12022.53, subdivisions (d) and (e)(1) enhancement. No additional term was imposed for the section 186.22, subdivision (b)(1) enhancement. However, the trial court added 10 years to Oliver's sentence for the section 186.22, subdivision (b)(1) enhancement, plus 25 years to life for the section 12022.53, subdivision (d) enhancement.

Assembly Bill No. 333 made significant changes to the definitions of "criminal street gang" and "pattern of criminal gang activity" and clarified the evidence needed to establish that an offense benefits, promotes, furthers or assists a criminal street gang.

A " 'criminal street gang' " was previously defined as "any ongoing organization, association, or group of three or more persons . . . whose members individually or collectively engage in, or have engaged in, a pattern of criminal gang activity." A pattern of criminal activity meant the commission of at least two offenses from a list of predicate crimes on separate occasions within three years of one another. (Former § 186.22, subd. (e).)

Under the revised definition, the predicate offenses must be committed by two or more "members" of the gang and must have commonly benefited a criminal street gang, with the last offense occurring within three years of the currently charged offense. The currently charged offense does not count as a predicate offense. The benefit derived from the predicate and current offenses must be "more than reputational." (§ 186.22, subd. (e), as amended by Assem. Bill No. 333.)

47

In summary, section 186.22 now "requires proof of the following additional requirements with respect to predicate offenses: (1) the offenses must have 'commonly benefited a criminal street gang' where the 'common benefit . . . is more than reputational'; (2) the last predicate offense must have occurred within three years of the date of the currently charged offense; (3) the predicate offenses must be committed on separate occasions or by two or more gang members, as opposed to persons; and (4) the charged offense cannot be used as a predicate offense." (*People v. Lopez* (2021) 73 Cal.App.5th 327, 345 (*Lopez*).)

The parties agree Assembly Bill No. 333's changes apply retroactively to the present case in which the judgment of conviction is not final. Defendants argue reversal is required because two predicate offenses are not established by evidence in the record.

The prosecution's challenge in this appeal is the challenge presented whenever the rules of engagement are changed after the battle is over. At the time of trial, section 186.22 did not require the prosecution to prove a common benefit that is more than reputational. Questions that might have ferreted out the precise benefit that accrued to a gang from a particular criminal act or excluded any thought the benefit was "reputational" were never asked. And the prosecution expert in testifying about benefit of such gang attacks spoke about enhancing the shooter's reputation, unaware that reputation would take on added significance in the future.

The People contend the enhancement is supported by three predicate offenses:

a. A shooting on Pinion Way

According to the People, Bryant, a FAB gang member, "shot someone" on Pinion Way. The exact date of the shooting is not detailed but it occurred sometime in July 2008. According to the People, "there was undisputed evidence presented at trial that Bryant was a FAB gang member and that Gunz Up was associated or 'cliqued up' with FAB." It is difficult to fathom how a shooting so bereft of details could qualify as a predicate offense. We think not.

48

b.  The shooting of Phillip Tigner

In the Tigner shooting, Bryant and other FAB gang members encountered Tigner who was with Demario Fulbright, a member of Guttah Boyz or G-Mobb.  Fulbright was attacked by Bryant and his gang members.  Tigner sought to help Fulbright.  Bryant shot Tigner.  Bryant was convicted of attempted murder with a gang enhancement, "for the benefit of F.A.B. [,which] is a criminal street gang."  Asked to describe whether the shooting had a benefit to the FAB/Gunz Up gangs, the prosecution expert indicated it benefitted the FAB gang:  "Basically it started as a fight.  The mentality is if you don't fear me, then you don't respect me."  "If you're not fearing me, then I'm going to force you to fear me by pulling the guns and shooting you."  The expert suggested no other benefit.

c.  The Nedra Court Shooting.

In this shooting on September 15, 2009, members of the Guttah Boyz traveled to Nedra Court and encountered Gunz Up gang members.  There was a shooting.  Winters, affiliated with Guttah Boyz, was shot, allegedly by a Gunz Up member.  When asked to describe the benefit, the expert used the same terms used to describe the benefit of the Tigner shooting:  "It's the whole if you don't fear me, then, you know I'm going to force you to fear me kind of mentality.  Respect, disrespect.'

"Q     And does that type of action and that type of conduct, does it have a benefit to the reputation of the Gunz Up gang?

"A     Yes.

"Q     How does it affect the reputation?

"A     It affects the reputation by, one, they're not looked at as weak.  If they're looked at as weak, they're looked at as inferior.  So if they're willing to pull a gun and shoot, they're looked at as somebody that you should be afraid of.  If you are afraid of them, then, you know, you fear me.  If you fear me, then you respect me."

49

The prosecution's case focused on reputational benefit, an understandable focus given the law at the time. So, of the three candidate predicate offenses, one is too lacking in details to qualify and the other two, in the estimation of the gang expert who testified about them, conferred a reputational benefit—adequate at the time of the testimony but now inadequate by the subsequent statutory change rendered by Assembly Bill No. 333.

The People argue that jury was not limited to the testimony of experts and could divine its own view of the benefit derived. However, we cannot divine from this record, in the absence of limiting instructions, whether the jury selected predicate offenses barred by the subsequently enacted Assembly Bill No. 333. So also, Assembly Bill No. 333 excludes consideration of the charged offense as a predicate offense, but the jury was not informed of this exclusion because the law was otherwise at the time of trial. It is impossible to determine whether the current offense was considered a predicate offense.

Under the circumstances, the proper remedy is to vacate the gang enhancement findings and remand to give the prosecution an opportunity to prove the applicability of the gang allegations under the new standards. (*Lopez, supra*, 73 Cal.App.5th at p. 346.)[4] We decline to also reverse the underlying substantive offenses as suggested by a recently published case, *People v. Burgos* (2022) 77 Cal.App.5th 550 cited by Washington. *Burgos* holds that a new procedure enacted in 2015, allowing the defense to request a bifurcated trial on gang enhancements, must be applied retroactively to cases tried long before enactment of the new statute. No other case so holds.

---

[4] Oliver also objects to the testimonial evidence offered by the prosecution in support of the predicate offenses, asserting that it constitutes testimonial hearsay, in violation of the Supreme Court's decision in *People v. Sanchez*. The objection is rendered moot by our conclusion that Assembly Bill No. 333 compels reversal of the enhancement.

**Sentencing Error**

Finally, Oliver contends that the abstract of judgment erroneously includes a five-year determinate term for count two. The People concede the issue.

The court sentenced Oliver on count two to an indeterminate prison term of 30 years to life, the middle term of five years on count two plus 25 years to life for the firearm enhancement. (§§ 186.22, subd. (b)(4)(A), 12022.53, subd. (d).) The court did not impose a five-year term on count two in addition to the 30-year-to-life term. Since the oral pronouncement of sentence is controlling, the abstract of judgment should be modified to reflect a 30-year-to-life term on count two. In addition, the People point out that the term imposed under section 186.22, subdivision (b)(4)(A) is listed as an enhancement but is actually an alternative penalty provision that combines the term of the underlying felony with applicable enhancements. Therefore, Oliver's abstract of judgment should be modified on both counts.

## DISPOSITION

In light of the amendments to section 186.22 made by Assembly Bill No. 333, we reverse the gang enhancements (§ 186.22, subd. (b)(1)) found true as to both defendants and remand to provide the prosecution an opportunity to retry the section 186.22 enhancements under the law as amended by Assembly Bill No. 333.

We direct the trial court to correct Oliver's abstract of judgment as to his sentence on count two.

The remaining judgments are conditionally reversed, and remanded to the juvenile court for juvenile transfer hearings. If that court determines it would have transferred either defendant to a court of criminal jurisdiction because he was not, at the time his case was originally filed in the trial court, "a fit and proper subject to be dealt with under the juvenile court law" (Welf. & Inst. Code, § 707.1, subd. (a)), the murder convictions and firearm enhancement findings are to be reinstated. The prosecution shall be permitted to retry the section 186.22 enhancements as to both defendants. Should either

51

defendant's conviction and enhancement findings be reinstated, his matter shall return to the trial court for a new sentencing hearing and an exercise of discretion under Senate Bill No. 620 (2017-2018 Reg. Sess.) (Stats. 2017, ch. 682, §§ 1 & 2) consistent with *People v. Tirado, supra*, 12 Cal.5th 688. Defendants shall be given an opportunity to supplement the record with information relevant to a future youth offender parole hearing.

If, however, the juvenile court finds it would not have so transferred either defendant, then it shall treat that defendant's conviction and enhancement findings as juvenile adjudications and impose an appropriate disposition within its discretion.

In all other respects, the modified judgments are affirmed.


           /s/
          RAYE, P. J.



We concur:



   /s/
HULL, J.



   /s/
HOCH, J.